UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
ALLIED PILOTS ASSOCIATION,          )
                                    )
        Plaintiff,                  )
                                    )
        v.                          )    Civil Action No. 09-0536  (PLF)
                                    )
AMERICAN AIRLINES, INC.,            )
                                    )
        Defendant.                  )
_____)

OPINION

This matter is before the Court on the motion of defendant American Airlines, Inc. ("American") to dismiss the plaintiff's complaint. By an Order dated July 16, 2010, the Court advised the parties that it would convert the defendant's motion to dismiss into a motion for summary judgment and gave them time in which to supplement the record and their arguments in light of that conversion. Both the plaintiff and the defendant submitted additional memoranda in response to the Court's Order. In addition, the plaintiff requested that the Court construe its filings as a cross-motion for summary judgment. After considering the parties' submissions, the relevant legal authorities, and the entire record in this case, the Court will grant the defendant's motion, deny the plaintiff's cross-motion, and enter judgment for American.[1]

---

[1] The papers reviewed by the Court in connection with the defendant's motion include the following: the plaintiff's complaint ("Compl."); the defendant's motion to dismiss, which has been converted into a motion for summary judgment ("MSJ"); plaintiff's opposition to the defendant's motion ("Opp."); the defendant's reply to the plaintiff's opposition ("Reply"); Declaration of John S.F. Gross (attached to MSJ), Ex. B ("CBA"); Declaration of John S.F. Gross, Ex. C (Decision and Award of the American Airlines Pilots' System Board of

I. BACKGROUND

Plaintiff Allied Pilots Association ("APA") serves as the certified collective bargaining representative of pilots who fly for American. Compl. ¶ 3. Under the collective bargaining agreement ("CBA") signed by the APA and American, "[a]ll flying performed by or on behalf of [American] or an Affiliate [is to] be performed by pilots on the American Airlines Pilots Seniority List," subject to limited exceptions that are enumerated in the CBA. CBA § 1(C)(1). The Seniority List, which is maintained by American, "contains the names of all pilots arranged in the order of system seniority, whether active or inactive, and the seniority date of each pilot." Id. § 13(G)(1).

While pilots on the Seniority List generally have a contractual right to do all of American's flying, the CBA makes an exception to that rule for flights subcontracted by American to commuter air carriers. Compl. ¶ 7; CBA § 1(D). That exception is limited, however, by a provision creating what is known as the "cockpit crewmember floor" ("crewmember floor" or "floor"):

> In the event that the number of cockpit crewmembers employed by [American] on the American Airlines Pilots Seniority List goes below 7300, the parties agree that the commuter [air carrier] exception . . . shall be terminable at the option of APA following a 90-day period to provide an opportunity for discussion. . . .

CBA § 1(D)(4). The CBA further specifies, in a provision known as the "merger exclusion," that "[p]ilots added to the American Airlines Pilots Seniority List by way of seniority merger shall not

---

Adjustment) ("Award"); plaintiff's submission in response to the Court's July 16, 2010 Order; defendant's supplemental memorandum in support of its dispositive motion; plaintiff's reply in support of its submission in response/motion for summary judgment.

count in calculating the number of cockpit crewmembers" that count toward the crewmember floor. Id.

In August of 2008, the APA filed a grievance in which it claimed that American was in violation of Section 1(D)(4), the provision of the CBA that establishes the cockpit crewmember floor. Compl. ¶ 12. According to the APA, "the number of cockpit crewmembers employed by [American] on the American Airlines Pilots Seniority List" at that time amounted to fewer than 7,300 because the following categories of pilots did not count towards the crewmember floor: (1) furloughed pilots, id. ¶ 15; (2) "pilots on medical, disability or military leave," Opp. at 4; (3) "Management and Chief pilots not covered by the CBA or even represented by the APA," id.; (4) pilots employed by American Eagle who had received a spot on American's Seniority List, id.; and (5) pilots "added to the American pilot workforce by American's 1999 acquisition of Reno Air and 2001 acquisition of TWA." Id. at 5. American, on the other hand, contended that all of those pilots did count towards the crewmember floor, and that the "number of cockpit crewmembers employed by [American]" therefore was considerably higher than 7,300. Opp. at 6.

In conformity with the terms of the CBA and the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.*, the APA submitted its grievance to the American Airlines System Board of Adjustment ("System Board" or "Board") for resolution. Compl. ¶ 12; see CBA § 23 (establishing the System Board and defining its duties and the scope of its authority); 45 U.S.C. §§ 153, 184 (providing for the establishment of adjustment boards by airlines and their employees). The grievance was heard by a Board panel consisting of two members appointed by

3

the APA, two members appointed by American, and one neutral arbitrator approved by both the APA and American. See Award at 27; CBA § 23(B)-(C).

The Board ruled in American's favor. Award at 25-26. After reviewing the factual background of the grievance and reciting the language of Section 1(D)(4) of the CBA, which creates and defines the crewmember floor, the Board summarized the arguments of the parties. It noted that, according to the APA, the pilots that could be counted toward the crewmember floor did not include "former TWA and Reno pilots; furloughed pilots; American Eagle pilots; management and Chief pilots, pilots on medical, disability, personal or military leave; Check Airmen; Tulsa pilots; and staff pilots." Id. at 4-5. After describing American's contrary interpretation of the CBA and reviewing basic principles of contract interpretation, the Board identified the issues before it as follows:

> The contract interpretation questions involving Section 1(D)(4) which are raised by the instant grievance relate primarily to the following: first, to the phrase "the number of cockpit crewmembers employed by the Company on the American Airline Pilot Seniority List," which defines the comparator group of current pilots who count against the 7,300 cockpit crewmember floor; and second, to the language added in 1997, "pilots added to the American Airline Pilot Seniority List by way of seniority merger," a group expressly excluded from counting against the floor.
>
> More precisely, does the first phrase encompass the entire pilot complement on the Seniority List or is it limited to active pilots[?] As to the "merger exclusion," should it be interpreted to deal only with future mergers after the [e]ffective date of the 2003 [CBA], or does it exclude all pilots added to the Seniority List by a merger after 1997[?]

Id. at 8.

To answer those interpretive questions, the Board analyzed the text, structure, purpose, and drafting history of the CBA. According to the Board, the original purpose of the crewmember floor, which was first added to the CBA in 1987, was to protect "the entire pilot complement on the Seniority List" from attrition. Award at 19. The Board based that conclusion at least in part on the testimony of Phillip Smythe, an American executive who had participated in the negotiation of the crewmember floor in 1987. Id. at 12-13. Mr. Smythe testified that the level of the crewmember floor was set at 6,285 in 1987 because that number encompassed "the entire Seniority List a[t] that time, both active and inactive pilots, and including Check airmen, management pilots, and pilots on leave." Id. at 12.

Guided by that understanding of the floor's purpose, the Board interpreted the language defining the floor broadly. Under the language of the CBA, the floor is to protect "cockpit crewmembers employed by the Company [American] on the American Airlines Pilots Seniority List." CBA § 1(D)(4). The APA argued that the phrase "employed by the Company" acts as a significant limitation on the number of pilots who counted towards the crewmember floor, applying only to those "pilots in active duty" and excluding "those on leave, in supervisory positions, and on furlough." Award at 9. The Board disagreed. It noted that the word "employ" is used in the CBA to refer both to active and inactive personnel and so does not necessarily refer only to active pilots in Section 1(D)(4). Id. Furthermore, the "inactive" pilots identified by the APA, while not currently flying for American, still possess various characteristics associated with employment. Id. For example, pilots "on medical disability receive[ ] a stream of income, retain seniority rights to return, and are carried on APA's membership database." Id. at 22. Pilots on other types of leave, though receiving "no compensation," "retain rights to return to

5

active employment and remain on APA's membership database." Id. Thus, contrary to the APA's assertions, the phrase "employed by the Company" did not unambiguously prevent pilots on leave from counting toward the crewmember floor.

Based on the history of the CBA and of Section 1(D)(4) in particular, the Board decided that pilots on leave were intended by the parties to the CBA to count toward the floor. When the level of the floor was first set in 1987, it was determined "based on the entire Seniority List," including "active and inactive pilots . . . and pilots on leave." Award at 12. In 1997, when the floor was adjusted upward, its new level was "based on a number that included . . . pilots in leave." Id. at 21. According to the Board, these factual findings indicated that the parties contemplated that pilots on leave would be considered "employed by the Company." Id. at 22.

The Board reached the same result with regard to pilots on furlough. Acknowledging that such pilots receive no compensation from American, the Board pointed out that they nevertheless have "contractual recall rights," meaning that, under the Railway Labor Act, they "retain an employee-employer relationship, and are thus 'employees' eligible to vote in [National Mediation Board] representation elections." Award at 25. As a result, the phrase "employed by the Company" does not necessarily exclude furloughed pilots. In addition, the Board found that the history of the CBA indicates that Section 1(D)(4) is not meant to provide furlough protection — that is, the crewmember floor was not written to deter American from placing pilots on furlough, which would be the effect of the provision if furloughed pilots did not count towards the floor. Id. at 16. In support of this conclusion, the Board pointed out that the 1997 version of the CBA incorporated a furlough protection clause unrelated to the crewmember floor, suggesting that furlough protection was not the aim or the effect of the floor. Id. Because

6

the language of Section 1(D)(4) does not, under the Board's reading, exclude furloughed pilots, and because the floor is meant to provide protection for a broad set of pilots on the Seniority List, the Board concluded that pilots on furlough do count towards the floor. Id. at 25.

The APA also contended before the Board that Section 1(D)(4) does not protect some 400 pilots employed by the commuter carrier American Eagle who gained the right to be placed on the American Seniority List in 1997. See Award at 24; Opp. at 13. As the APA pointed out, those pilots are employed by American Eagle, not by American. Award at 24. According to the APA, they therefore are not encompassed within Section 1(D)(4) of the CBA because they are not "employed by the Company." The Board, while noting that it was "not unsympathetic" to that argument, nevertheless rejected it. Id. Noting that the American Eagle pilots received the right to be placed on the Seniority List only by negotiating an agreement with the APA, the Board pointed out that by contracting to receive a place on the Seniority List, the American Eagle pilots secured the rights that come with a place on the List, including the protection provided by the crewmember floor. Id. The APA could have prevented the American Eagle pilots from receiving that protection by including a provision to that effect in its agreement with them, but it failed to do so and so must bear the consequences. Id.

Having addressed the parties' dispute concerning the meaning of the phrase "employed by the Company," the Board turned to the phrase "cockpit crewmember." The APA argued that only line pilots, not management or chief pilots or check airmen, count toward the crewmember floor. Award at 23; see also Opp. at 14. Noting that each of the types of pilot that the APA sought to exclude also serves as a line pilot at least sporadically, the Board concluded that management or chief pilots and check airmen fall within the scope of Section 1(D)(4).

7

Award at 23. That conclusion followed from the fact that the level of the crewmember floor was set in 1987 based on a number of pilots that included management pilots as well as check airmen. Id. at 12; id. at 10.

The Board's last task was to interpret the merger exclusion clause: "Pilots added to the American Airlines Pilots Seniority List by way of seniority merger shall not count in calculating the number of cockpit crewmembers" that count toward the crewmember floor. CBA § 1(D)(4). The merger exclusion language was first included in the CBA in 1997 and was retained when the CBA was revised and renewed by the parties in 2003. See Award at 16; CBA § 1(D)(4). According to the APA, the merger exclusion prevents from counting toward the crewmember floor any pilots who were added to American's Seniority List by means of a merger that occurred after the signing date of the 1997 CBA. See Award at 10. By that logic, pilots added to the Seniority List in connection with American's acquisition of TWA in 2001 and Reno Air in 2000 do not count toward the floor. Id.

The Board found the APA's logic unpersuasive, concluding that the language of the merger exclusion "was intended to apply only to future mergers during the term of an Agreement." Award at 19. It reached that conclusion first by determining, based on the negotiations leading to the adoption of the merger exclusion, that "the purpose of the . . . provision was to protect APA from post-Agreement mergers." Id. at 20. Since the provision was intended to provide protection from future events, it applied only prospectively — that is, only in the event that pilots were added to the Seniority List by a merger that occurred after the effective date of the CBA containing the provision. Id. As a result, the 1997 exclusion clause did initially operate to prevent the TWA and Reno pilots from counting towards the crewmember floor. Id. at

16. Once a new version of the CBA was adopted in 2003, however, the 1997 version was superseded and rendered ineffective. Award at 20. While the 2003 CBA also contained a merger exclusion clause, that provision was phrased in exactly the same language as the 1997 provision, and so should have the same meaning and effect; it should apply only prospectively, to mergers occurring *after* the adoption of the 2003 agreement. Id. at 20-21. By that logic, the 2003 merger exclusion clause would not apply to pilots added to the Seniority List by means of mergers that occurred in 1999 and 2000. Id.

The Board's conclusion that the 1997 and 2003 merger exclusion clauses should operate in the manner described — that they should apply only to mergers occurring within the term of the specific version of the agreement in which each clause appeared — was based on a review of the drafting history and the purposes of the crewmember floor. In the Board's judgment, the crewmember floor was adopted "as a protection of the size of the entire pilot complement in the Seniority List against attrition." Award at 13. Counting towards the crewmember floor any pilots added to the List by merger after the signing of the operative CBA could undermine that purpose "by masking the attrition in the Seniority List." Id. at 20. Once the CBA operative at the time of a merger had expired and been replaced by a renegotiated CBA, however, the APA had the opportunity to correct for the effect on the List of any pilots added by merger — by negotiating for a higher crewmember floor. See id. at 21. Because the APA could protect its interests by negotiation once the time to adopt a new CBA had come, there was no need to prevent from counting toward the crewmember floor any pilots added to the List by merger prior to the adoption of a given CBA. Id. Indeed, the Board noted, the APA attempted to

9

negotiate for an increase in the crewmember floor to compensate for the addition of the Reno pilots multiple times in the years leading up to the adoption of the 2003 CBA. Id.

Having examined and rejected each of the APA's arguments, the Board found "that American has over 11,300 pilots on its current Seniority List" and so "is not in violation [of CBA] Section 1.D.4. with regard to the Cockpit Crewmember Floor." Award at 26. Two Board members — those appointed by the APA — dissented. Id. at 27. The APA subsequently filed the pending complaint before this Court, seeking *vacatur* of the Board's decision.

## II. DISCUSSION

Under the Railway Labor Act ("RLA"), which applies to employees of air carriers, see 45 U.S.C. §§ 181-88, the "findings and order" issued by an Adjustment Board to resolve a labor dispute are "conclusive on the parties" unless one or more of three conditions are met: (1) the Board failed "to comply with the requirements of" the RLA; (2) the Board's award fails "to conform, or confine itself, to matters within the scope of the [Board's] jurisdiction"; or (3) a member of the Board has engaged in "fraud or corruption" related to the issuance of the award. 45 U.S.C. § 153 First (q); see Northwest Airlines, Inc. v. Air Line Pilots Ass'n, Int'l, 808 F.2d 76, 80 (D.C. Cir. 1987) (applying this standard in an airline labor dispute). Only the second of those conditions is at issue in this case. The APA contends that the Board acted in excess of its jurisdiction in rejecting the APA's interpretations of Section 1(D)(4) of the CBA. Compl. ¶ 18; Opp. at 11.

A labor arbitration board acts within the scope of its jurisdiction so long as its final award is "confined to interpretation and application of the collective bargaining agreement."

United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 591, 597 (1960). If "the arbitrator's decision 'draws its essence from the collective bargaining agreement,' it must be enforced." Northwest Airlines, Inc. v. Air Line Pilots Ass'n, Int'l, 808 F.2d at 82 (quoting United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. at 597). That "extraordinarily deferential" standard "is met . . . if the arbitrator 'premise[d] [its] award on [its] construction of the contract." Nat'l Postal Mail Handlers v. Am. Postal Workers Union, 589 F.3d 437, 441 (D.C. Cir. 2009) (quoting United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. at 598). In reviewing the arbitration award, a court asks only "whether the arbitrator was 'even arguably construing or applying the contract.'" Id. (quoting Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509 (2001)). Admittedly, this is an "extraordinarily deferential standard." Id.

Perhaps most importantly, because "[t]he federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards," United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 36 (1987), "[c]ourts do not review the substantive reasonableness of a labor arbitrator's contract interpretation." Nat'l Postal Mail Handlers v. Am. Postal Workers Union, 589 F.3d at 441. Because the parties "'authorized the arbitrator to give meaning to the language of the [collective bargaining] agreement,'" a court "'cannot reject [the arbitrator's] award on the ground that the arbitrator misread the contract.'" Madison Hotel v. Hotel & Restaurant Employees Local 25, 144 F.3d 855, 859 (D.C. Cir. 1998) (quoting United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. at 38). That principle holds true even where the court is convinced that "the arbitrator erred — or even seriously erred — in interpreting the contract." Nat'l Postal Mail Handlers v. Am. Postal

11

Workers Union, 589 F.3d at 441. The arbitrator's decision may be set aside "only if the arbitrator [has] 'stray[ed] from interpretation and application of the agreement and effectively dispense[d] his own brand of industrial justice.'" Id. (quoting E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17, 531 U.S. 57, 62 (2000)) (internal quotation marks omitted).

The APA contends that the award issued by the Board fails to draw its essence from the CBA because it "contradict[s]" and "ignore[s]" the "plain language" of the contract. Opp. at 11. According to the APA, the language of Section 1(D)(4) so clearly supports the APA's interpretation of the CBA that the Board necessarily "applied its own brand of industrial justice [and] exceeded the scope of its jurisdiction" by rejecting that interpretation. Compl. ¶ 16. Neither the language of the CBA nor the reasoning employed by the Board, however, supports the APA's argument.

The APA insists that the Board, in finding that inactive, management, and American Eagle pilots count toward the crewmember floor, "render[ed] the . . . terms 'cockpit crewmembers' and 'employed by the Company' a nullity." Opp. at 13. That argument assumes the outcome of one of the main questions before the Board: what is the meaning of the phrases "cockpit crewmembers" and "employed by the Company"? Contrary to the APA's assertions, neither of those phrases has a self-evident, unambiguous meaning, and neither is explicitly defined in the CBA itself. In interpreting those phrases, the Board drew on basic and appropriate tools for contract interpretation — the text, structure, purpose, and history of the CBA — in order to ascertain the parties' intention in negotiating and adopting the language in question. It therefore did precisely what it was called upon and authorized to do, and, since it was undoubtedly "construing or applying the contract," it acted well within its jurisdiction. Nat'l

Postal Mail Handlers v. Am. Postal Workers Union, 589 F.3d at 441 (citation and internal quotation marks omitted).

The APA's arguments to the contrary are simply challenges to the merits of the Board's conclusion thinly disguised as jurisdictional challenges. For example, the APA insists that allowing American Eagle pilots to count toward the crewmember floor disserves the floor's purpose because that purpose is "to prevent diversion of American flying jobs to commuter carriers," and "including the Eagle pilots in the Floor . . . mak[es] the Floor a mechanism by which to enable the diversion of American Flying jobs to a commuter carrier." Opp. at 13 (emphasis in original). As a factual matter, the Board determined that the crewmember floor was meant to protect the jobs of American pilots by protecting "the entire pilot complement on the Seniority List" from attrition. Award at 19. That function of the List would be served if American Eagle pilots, who appeared on the Seniority List by virtue of an agreement with the APA, were counted towards the floor. Id. at 24. In making that determination regarding the purpose of the floor and the addition of the American Eagle pilots to the Seniority List, the Board may have erred, as the APA suggests. But because the Board reached its decision by construing the CBA, it is not the task of this Court to correct the Board's interpretation, even if that interpretation was "badly mistaken." Nat'l Postal Mail Handlers v. Am. Postal Workers Union, 589 F.3d at 443; see also U.S. Postal Serv. v. Am. Postal Workers Union, 553 F.3d 686, 695 (D.C. Cir. 2009) ("[U]nder Enterprise Wheel and its progeny, the arbitrator has a right to be wrong in his interpretation of the parties' CBA.").

Similarly, the APA's substantive disagreements with the Board's findings that furloughed pilots, management pilots, and pilots on leave should count toward the crewmember

13

floor, see 13-15, do not change the fact that the Board made those findings based on its interpretation of the CBA. The Board explained its reasoning in terms of the CBA's language, purpose, and history. It thus was "at least arguably construing or applying the contract" and so issued a decision that drew its essence from the CBA. Nat'l Postal Mail Handlers v. Am. Postal Workers Union, 589 F.3d at 444.

The APA's arguments regarding the merger exclusion clause must also fail. According to the APA, the Board "effected a change in the terms of the CBA" by finding that the merger exclusion applied to the Reno and TWA pilots while the 1997 CBA was in effect, but not once the 2003 CBA had become effective. Opp. at 16. Far from changing the meaning of the merger exclusion, however, the Board applied it entirely consistently: it found that in both the 1997 and the 2003 CBA the exclusion applied prospectively to pilots added to the Seniority List by merger, but only for so long as the version of the CBA in effect at the time of the merger remained operative. See Award at 19-21. The APA may disagree that the clause should, in fact, operate in that manner, but again, such a disagreement is grounded in a dispute over the manner in which the CBA should be interpreted — the province of the Board, not a reviewing court. See, e.g., U.S. Postal Serv. v. Am. Postal Workers Union, 553 F.3d at 695 ("It does not matter whether [the Court] agree[s] with [an arbitrator's] reasoning or judgment, so long as [the Court] find[s] that [the] award rested on [the arbitrator's] construction of the CBA.").

III. CONCLUSION

For the foregoing reasons, the Court will grant the defendant's motion for summary judgment and deny the plaintiff's cross-motion for summary judgment. An Order consistent with this Opinion will issue this same day.

SO ORDERED.

/s/_____
PAUL L. FRIEDMAN
United States District Court

DATE: August 30, 2010